# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **1:21-CR-638** |
| | : | |
| **v.** | : | |
| | : | |
| **GILBERT FONTICOBA** | : | |
| | / | |

## MOTION TO TRANSFER VENUE AND
## MEMORANDUM OF LAW

COMES NOW, the Defendant, Gilbert Fonticoba, by and through his attorney, pursuant to Rule 21(a) of the Federal Rules of Criminal Procedure, and the Fifth and Sixth Amendments to the United States Constitution, and respectfully moves for a change of venue and asks the Court to move his trial outside the District by using a venire from a neighboring district, such as the Eastern District of Virginia or the District of Maryland, with the actual trial being held in the District of Columbia.

Venue survey data obtained reveals in part:

A. 88% of registered D.C. voters[1] believe that if someone went inside the Capitol building on January 6, 2021 ("J6[2]"), he or she should be convicted of obstruction of justice and civil disorder;
B. 73% of respondents believed that anyone who merely entered the Capitol building on J6 is guilty of insurrection;
C. A majority (64%) of respondents believe that anyone who entered the Capitol building on J6 is responsible for others protestors' violence and destruction of property;
D. 70% of respondents believe that anyone who went inside the Capitol building on January 6 was trying to stop the certification of the electoral vote for president.

---

[1] Survey participants are registered D.C. voters, and thus representative of the potential venire, and will be referred to as respondents.

[2] The terms J6, January 6th, and January 6 will be used interchangeably throughout this pleading.

Fonticoba relies in part on jury consultant John Zogby's survey of 400

Washington, D.C. registered voters regarding their opinions about the January 6,

2021, events at the Capitol building and sources of media about such events.

(Survey results and tabulations attached as Exhibit A). Greater than 9 in 10

respondents (95%) said they have overall familiarity (very and somewhat

combined) with the January 6, 2021, events at the Capitol; and more than two-

thirds (67%) of whom stated they are very familiar with these events.

Fonticoba also relies on the survey by D.C. residents commissioned by the

Federal Public Defender of Eastern District of Virginia, and used in support of a

change of venue motion in the J6 case of *USA v. R. Gieswein*, 21-CR-24-EGS.

(Attached here as Exhibit B). The results and conclusions parallel Zogby's survey.

For example, in that survey, 85% of D.C. jurors already think they know that

those who went into the Capitol on January 6 were there to try to "overturn the

election and keep Donald Trump in power." *USA v. R. Gieswein,* 21-CR-24-EGS,

ECF No. 101-1 ¶¶ 15, 18.6. And, 76% of respondents describe those who went

into the Capitol as "insurrectionists," and 72% would describe them as "trying to

overthrow the United States government." Id. at ECF No. 101-1 ¶¶ 15, 18. This

study also compared D.C. jurors' results with national polling data. Tellingly, the

high-level of bias of D.C. residents when compared to the data from the rest of the

country further highlights the extreme prejudice particular to D.C. (See the data

table at pages 4 and 5 of Harrison Hickman Survey).

Accordingly, based on the Sixth Amendment, the two surveys below, and Supreme Court caselaw, Fonticoba submits that detrimental pretrial publicity and extreme community prejudice toward the Proud Boys in the District of Columbia are so likely to have affected the jury pool, that the venire must be presumed to be tainted—and that no voir dire can remedy or mitigate this extreme level of prejudice.

In addition, in the recent so-called Proud Boys leaders' trial, a case obsessively followed by D.C. local media, Fonticoba's name was brought up numerous times in testimony in the context of him being part of the seditious conspiracy with Defendant Enrique Tarrio. In fact, in this case, much of the Government's evidence against Fonticoba involves videos of him socializing with Tarrio and other Proud Boys—and these videos were not even taken during the Capitol riot on January 6. In this regard, Fonticoba will withdraw this motion now, if the Government agreed and stipulated that it would not mention the Proud Boys, or his affiliation with them, at all during his trial.

## I. FACTUAL AND PROCEDURAL GROUNDS

This indictment stems from the events at the United States Capitol building on January 6, 2021. During the rally at the National Mall, political statements favorable to President Trump, along with criticism of the national election, were made by numerous speakers, including the President. President Trump then told

the crowd to walk down to the Capitol building to peacefully protest and express their political grievances, and that he would walk with them. Members of the crowd walked down to the Capitol. As a result of the events that unfolded on that day, the Government charged hundreds of individuals, including Fonticoba, with federal felonies and misdemeanors in the District of Columbia.

On October 22, 2021, a grand jury returned a six-count indictment charging Fonticoba with: 18 U.S.C. § 231(a)(3), (civil disorder); 18 U.S.C. § 1512(c)(2), (obstruction of an official proceeding); 18 U.S.C. §§ 1752(a)(1) and (2) (entering and remaining in a restricted building or grounds and disorderly and disruptive conduct in a restricted building or grounds); and 40 U.S.C. §§ 5104(e)(2)(D) and (G) (disorderly conduct in a Capitol building and parading, demonstrating, or picking in a Capitol building). (DE 1).

### A. Attorney General Merrick Garland Has Compared J6 To The Oklahoma City Bombing And National Leaders Continue To Compare J6 To Pearl Harbor, 9/11, And The Civil War

Attorney General Garland stated, "there was a line that connected the January insurrection to the Oklahoma City bombing and back to the battles of the original Justice Department against the Ku Klux Klan."[3] Garland's comparison is revealing, because in the Oklahoma City bombing case, Garland supervised the prosecutors that agreed that the Eastern District of Oklahoma could not provide a fair trial, and consented to a transfer of venue to Colorado. *United States v.*

---

[3] Merrick Garland ties Oklahoma City bombing to Capitol riot (yahoo.com) (June 15, 2021).

*McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) ("There is no disagreement among the parties with Judge Alley's concern about a trial in Oklahoma City. The effects of the explosion on that community are so profound and pervasive that no detailed discussion is necessary."). The same result should occur here.

Indeed, political leaders keep describing January 6th as one of the greatest tragedies in American history, and in the same league as the 9/11 terrorist attacks, the Oklahoma City Bombing, Pearl Harbor, and the Civil War. President Biden called J6, "one of the worst attacks on our democracy," in his speech before a joint session of Congress.[4]

## MEMORANDUM OF LAW

## II. LEGAL STANDARD

The Fifth and Sixth Amendment of the United States Constitution entitle criminal defendants to a fair trial by an impartial jury. "The great value of the trial by jury certainly consists in its fairness and impartiality." *United States v. Burr*, 25 F. Cas. 49, 51 (CC Va. 1807). The right to an impartial jury is a cornerstone of due process. *In re Murchison*, 349 U.S. 133, 136 (1955). Federal Rule of Criminal Procedure 21(a) instructs that district courts "must transfer the proceeding . . . if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there."

---

[4] Right-wing erupts after Biden declares Jan. 6 "worst attack on democracy since Civil War" | Salon.com (April 28, 2021).

Courts consider the following factors in determining whether to grant a change of venue request are (1) the size and characteristics of the community; (2) the nature and extent of pretrial publicity; (3) the proximity between the publicity and the trial; and (4) evidence of juror partiality. *See Skilling*, 561 U.S. 358, 378-81 (2010).[5] While the *Skilling* factors likely apply to the instant matter, in some cases, a potential jury pool can be presumed to be irredeemably biased, when the alleged crime results in "effects . . . on [a] community [that] are so profound and pervasive that no detailed discussion of the [pretrial publicity and juror partiality] evidence is necessary." *United States v. McVeigh*, 918 F. Supp. 1467, 1470 (W.D. Okla. 1996) (transferring the trial of the Oklahoma City bombing suspects from Oklahoma City to the District of Colorado).

**A. Supreme Court Precedent Mandates A Change Of Venue Before Voir Dire In Unique Cases Where There Is Presumed Prejudice**

There are indeed federal cases where venue was changed prior to voir dire to ensure the constitutional guarantee of an impartial jury was preserved, and Fonticoba's case falls in this category. *See United State v. McVeigh*, 918 F. Supp. 1467, 1474 (W.D. Okla. 1996) (reasoning that the "emotional burden of the explosion and its consequences" on all Oklahoma City residents, even those personally unaffected, caused "so great a prejudice against defendants in the State of Oklahoma that they cannot obtain a fair and impartial trial.").

---

[5] The Constitution's place-of-trial prescriptions do not impede transfer of the proceeding to a different district at the defendant's request if extraordinary local prejudice will prevent a fair trial. *See Skilling v. United States*, 561 U.S. 358, 378 (2010).

The Supreme Court has held that the refusal to grant a change of venue is a denial of due process as guaranteed by the federal Constitution, based on the extreme community prejudice fueled by media of the case. *Rideau v. State of Louisiana*, 83 S.Ct. 1417 (1963). Such is the case here. Under *Rideau*, there is no requirement to wait and hopefully see if voir dire comes off successfully, because the extreme nature of the case and the circumstances. Just like Rideau's jailhouse confession was televised widely throughout the parish, the events of January 6 at the Capitol were broadcast live, and have been replayed almost every day since through television, laptops, and smartphones.

Historically, state courts have also transferred venue before voir dire in certain infamous cases, in order to adhere to the Constitution's requirement of an impartial jury. *See, e.g., Parker v. Gladden,* 385 U.S. 363 (1966). For example, the D.C. Sniper John Muhammad's case was transferred to another county in Virginia, because the trial judge found all of Fairfax County could be considered victims; and in the Casey Anthony trial, the judge granted a change of venue by picking a jury from a venire from a different county, Pinellas County, and then moved the actual trial back to Orlando.

## B. This Watergate-era Venue Cases From this Circuit Rely On Antiquated Reasoning And Are Inapposite To This Case

The *Haldeman* case relied on the antiquated rationale, dismissing outright any survey venire studies. *United States v. Haldeman*, 559 F.2d 31, 61 (D.C. Cir. 1976)

(en banc) (per curiam). *Haldeman* is not analogous to the January 6 cases, much less to Fonticoba's. In *Haldeman*, the court categorically dismissed a survey of D.C. residents' pretrial prejudice by reasoning that is could not be trusted because it was paid for. *Haldeman*, 559 F.2d at 62, 64 n. 43 (1979) (describing all pretrial prejudice polls as "suspect" and stating that the trial court did not have to consider a poll "paid for by one side"). Secondly, in all of these Watergate cases, the defendants were being tried for their discrete crimes, and not part of largest, and arguably most unique, novel prosecution in DOJ history as the January 6 prosecution is. And most of these cases were decided under vastly different procedural grounds at the appellate level, where their legal burdens were unusually high.

Similarly, any reliance to venue decisions in the prosecutions Oliver North or John Poindexter is equally misplaced. These cases were tried more than 30 years ago and did not garner the media sensation that the January 6 Capitol Riot did and still does. Also, news coverage and media technology, along with the evolution of social media and smartphones, have advanced light years to what it was in the 1970's and 1980's.

Likewise, the Government's January 6 prosecution cannot be compared to other notorious cases charged with crimes like murder. For instance, in *Tsarnaev*, the defendant took an interlocutory appeal after the first day of jury selection on a writ of mandamus. *In re Tsarnaev*, 780 F.3d 14, 19 (1st Cir. 2015). The standard of review for such a writ in the First Circuit was exceptionally high, "ha[ving] customarily

been granted only when the lower court . . . [has] exceeded its discretion to such a degree that its actions amount to a usurpation of power." *Id.*

Similarly, in the 9-11 hijacker case of *Moussaoui,* the Fourth Circuit "affirmed the denial of pre-trial prejudice motions," but did so on the grounds that the pro se defendant's interlocutory appeal was not within the jurisdiction of the appellate court. *United States v. Moussaoui*, 43 Fed.Appx. 612, 614 (4th Cir. 2002). Also, in the World Trade Center bombing case of *Yousef*, the Second Circuit held that the trial court did not abuse his discretion by denying a request to change venue, but on a procedural ground as *Yousef* "did not renew [his] motion for a change of venue after the voir dire—an indication that counsel was satisfied that the voir dire resulted in a jury that had not been tainted by publicity." *United States v.Yousef*, 327 F.3d 56, 155 (2d Cir. 2003).

A case of more recent vintage, but that is also equally inapposite, is the Cuban spy case of *United States v. Campa et al.*, 459 F.3d 1121 (11th Cir. 2006) (en banc), which, like *Haldeman*, also cast blanket aspersions on surveys. The full context of that saga has to be considered too, where the court en banc reversed the ruling of its own panel. *Id.* Indeed, the polling and bias was scientifically valid enough to convince the original 3-judge panel of the 11th Circuit in a 73-page opinion that venue should have been transferred out of Miami. 419 F.3d 1219 (2005). Notably, in a remarkable passage about the importance of fair jury trials to American jurisprudence as an example to the world, the last paragraph of Circuit Judge Birch's

dissent from the en banc decision in *Campa* is quite pertinent here:

> I am aware that, for many of the same reasons discussed above, the reversal of these convictions would be unpopular and even offensive to many citizens. However, I am equally mindful that those same citizens cherish and support the freedoms they enjoy in this country that are unavailable to residents of Cuba. One of our most sacred freedoms is the right to be tried fairly in a noncoercive atmosphere and thus be afforded a fair trial. In the final analysis, we are a nation of laws in which every defendant, no matter how unpopular, must be treated fairly—a concept many consider alien to the current Cuban regime. Our Constitution requires no less.

(emphasis added). This Court and the Government should heed Judge Birch's sage admonition.

## C. The Constitution Guarantees Fonticoba An Impartial Jury, Not The 12 Least-Prejudiced D.C. Jurors

The Constitution guarantees an impartial jury to Fonticoba not the Government. His right to an impartial jury is secured by the Sixth Amendment and arguably the Fifth Amendment's Due Process Clause. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors."); *Sheppard v. Maxwell,* 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influences."). Not surprisingly, Fonticoba fears that well-intentioned jurors will be so latently biased that the jurors themselves will not be able to discern it. *See Irvin* at 728 ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a

declaration before one's fellows is of its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight."). And he also fears many potential D.C. jurors will be reluctant to admit their true bias in voir dire and just give people-pleasing answers stating they can be fair and impartial.

By having the trial in D.C., the Government is demonstrating that convictions from prosecutorial-friendly jurors are more important than constitutional guarantees for the accused—something not lost on the rest of the world and the Nation. Regrettably, in such a historic prosecution, any conviction of a Proud Boy by a D.C. jury will forever be tainted, questioned, and held to ridicule as vigilante-like justice, reeking of political comeuppance. If their evidence is strong enough for an indictment, the Government should be able to get its conviction in any jurisdiction in America.

Ultimately, the Government cannot have it both ways: on the one hand, they accuse Fonticoba of obstructing the peaceful transfer of power of a presidential election, applying for the first time an obscure witness tampering statute, 18 U.S.C. §1512 in novel way, where there is a 20-year prison maximum (the same punishment as sedition); and on the other hand, they assert his case is nothing special and just another criminal trial where voir dire will filter out any pretrial prejudice.

## **ARGUMENT**

A review of the *Skilling* factors weigh in favor of transferring Fonticoba's case from the District of Columbia.

### 1.   Size And Characteristics Of The Community

Washington, D.C. is a relatively small community, with a population of about 700,000, and an estimated potential jury pool of less than 500,000.[6] Approximately 93% of voters in Washington voted against Donald Trump, rendering it the least diverse political population in the country.[7] The loathing towards Donald Trump and his supporters in the District is obvious. The Democratic candidate received more than 90% of the vote in both elections. This astounding lack of political diversity is unique to the jury pool for the District of Columbia. Unfortunately, America's current political divide is at remarkable levels[8] and the results of Zogby's survey of D.C. voters bears this out: 73% of respondents believe that any individual who was inside the US Capitol on J6 should be convicted of insurrection—a charge not even the Government has levied.

The D.C. jury pool, already politically averse to Donald Trump supporters, has been besieged with daily media coverage of the same by the media following the January 6 incident. According to a Pew Research Center poll, Democrats were significantly more likely to hear about the Capitol incident than Republicans.[9]

If Fonticoba proceeds to trial in Washington, D.C., the jury pool in his case would be comprised of those who voted nearly unanimously against Donald Trump

---

[6] See District of Columbia, The Urban Institute (September 2021), https://www.urban.org/policycenters/cross-center-initiatives/state-and-local-finance-initiative/projects/state-fiscalbriefs/Washington-dc (last visited Jan. 11, 2022).
[7] See Election results: The 2020 presidential race, Politico.com (2021); https://www.politico.com/2020-election/results/president (last visited Jan. 11, 2022).
[8] See 'America is exceptional in the nature of its political divide,' Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2020/11/13/america-is-exceptional-in-the-nature-of-its-political-divide/ (last visited Oct. 14, 2021).
[9] Views on the U.S. Capitol riot, Pew Research Center (2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ (last visited Oct. 14, 2021).

and have been barraged with propaganda about a "white nationalist" attack of Proud Boys and are continuously told they were victims of an "insurrection," who were placed under curfew and locked down as a result of danger posed by "Domestic Violent Extremists" like the Proud Boys. Again, Zogby's survey confirms this extreme bias present in D.C., because 66% of respondents agreed that J6 posed a dire threat and the worst assault on U.S. democracy since Pearl Harbor.

In addition, the jury would be overseeing the case of a defendant they have gotten to know as a Proud Boy in that group of "insurrectionists" who triggered the city's siege. The daily lives of members of the potential jury pool were disrupted in the days, weeks, and months following J6, since travel and transportation were limited and disrupted in that section of Washington. The unavoidable community prejudice, and particularized prejudice against Fonticoba render any venire so greatly prejudiced against him that he cannot obtain a fair and impartial trial in Washington, D.C.

Indeed, jurors would feel shame to even raise the possibility of a not guilty verdict in the Washington, D.C. community of jurors. "Bias can infect the cognitive process from beginning to end and anywhere between," and "political commitments are very likely to give rise to bias," according to a Florida State University study on the issue of liberal bias.[10] A 2018 study of 51 experimental studies involving over 18,000 participants examined the prevalence of political bias when it challenged

---

[10] Bo Winegard el al., Equalitarianism: A Source of Liberal Bias (May 8, 2018), https://ssrn.com/abstract=3175680.

political beliefs or allegiances.[11] The researchers found that people exhibited a bias in favor of their own politics, that they saw information as "more valid and compelling when it confirmed rather than challenged their political affinities."[12]

Considering the extreme community prejudice and the highly politicized environment of Washington D.C., a fair trial for Fonticoba is improbable. This improbability can be computed. In assessing human behavior, the United States Court of Appeals for the District of Columbia created a fitting test: "We are concerned not simply with probabilities, but with conditional probabilities: if one event occurs, how likely is it that another event will occur?" *United States v. Prandy-Binett*, 995 F. 2d 1069, 1070 (D.C. Cir. 1993); *United States v. (Monte) Brown*, 374 F. 3d 1326, 1328 (D.C. Cir. 2004); *see also Skilling*, 130 S.Ct. at 2948 ("[A]s the tide of public enmity rises, so too does the danger that the prejudices of the community will infiltrate the jury"). The value of this analysis is to consider the effect of circumstances in the cumulative. *United States v. Prandy-Binett II*, 5 F. 3d 558, 559 (D.C. Cir. 1993). Certainly, this conditional probability analysis is pertinent to reviewing prospective jurors.

### 2. Nature And Extent Of Pretrial Publicity-It Is Not Necessary For The Jury Pool To Have Heard Of Defendant Or Any News Related To Him Prior To Trial, As Once They Hear He Was Associated With The Proud Boys, Their Bias Will Be Too Strong

Fonticoba's case is tied to an event that was so impactful on the consciousness

---

[11] Peter H. Ditto et al., At Least Bias Is Bipartisan: A Meta-Analytic Comparison of Partisan Bias in Liberals and Conservatives, 14 Perspectives on Psychological Science 273-291 (2018).
[12] Id.

of District residents that it is impossible for local jurors to reach a fair and impartial verdict. District residents have been bombarded with wall-to-wall coverage of the January 6th events, related arrests, criminal charges and, more recently, prosecutorial outcomes. The National Guard was deployed to Washington, D.C. for more than four months after the incident.[13] The Mayor of D.C. declared a state of emergency and implemented a 6 P.M. curfew for weeks.[14] The District implemented significant closures of roads and public spaces in advance of President Biden's inauguration, in direct response to the violence at the Capitol on January 6th.[15]

Though there are no longer road closures, and the National Guard has stepped down, politicians still remind D.C. residents that J6 was one of the worst days in our nation's history, like the Vice President did on the anniversary of January 6, 2022:

> Certain dates echo throughout history, including dates that instantly remind all who have lived through them -- where they were and what they were doing when our democracy came under assault. Dates that occupy not only a place on our calendars, but a place in our collective memory. December 7th, 1941. September 11th, 2001. And January 6th, 2021.[16]

The Department of Homeland Security declared that government offices were

---

[13]See National Guard troops leave US Capitol more than 4 months after January 6th riot, FOX5 Washington DC, https://www.fox5dc.com/news/national-guard-troops-leave-us-capitol-more-than-4-months-after-january-6th-riot

[14]Press Release, Mayor Muriel Bowser, January 6, 2021, https://mayor.dc.gov/release/mayor-bowser-issues-mayor's-order-extending-today's-public-emergency-15-days-a1 (last visited Nov. 22, 2021).

[15]DC Inauguration Updates: 4 Bridges Between DC, Virginia Closing; National Mall Closed; NBC4 Washington, https://www.nbcwashington.com/news/local/dc-inauguration-updates-fridayclosures- threats-national-mall/2542719/ (last visited Jan. 11, 2022).

[16]Vice President Kamala Harris' remarks on January 6 anniversary Updated 11:13 AM ET, Thu January 6, 2022 https://www.cnn.com/2022/01/06/politics/transcript-kamala-harris-january-6-anniversary-speech/index.html

potential targets of violent domestic extremists, who were emboldened by the "recent mob assault" on the Capitol.[17] Every potential juror in the District was impacted by the events on Capitol Hill on January 6th.

Our nation's leaders have continued to cast aspersions on individuals like Fonticoba. While speaking in Washington, D.C., President Biden referred to Trump supporters involved in the January 6th incident as "a group of thugs, insurrectionists, political extremists, and white supremacists."[18] While on the House floor in Washington, D.C., Representative Cori Bush called the January 6th incident "a white supremacist insurrection" and a "domestic terror attack."[19] Indeed, within the first week of the incident 73% of Democrat leaders in Washington referred to the January 6th event as an "insurrection."[20] Democrat lawmakers' social media engagement skyrocketed after January 6th as they began heavily discussing the incident.[21] By February 2021, it became second nature for Democrats to describe the incident as an "insurrection" and refer to Trump supporters as "white supremacists."

And before the Senate Judiciary Committee on February 22, 2021, Attorney

---

[17]DHS Warns of Heightened Threats from Violent Domestic Extremists, NPR, https://www.npr.org/2021/01/28/961470061/dhs-warns-of-heightened-threats-from-violent domestic-extremists (last visited Jan. 11, 2022).

[18]Remarks by President Biden at Signing of an Executive Order on Racial Equity, The White House (2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity (last visited Nov. 19, 2021).

[19]Rep. Cori Bush Calls Trump 'White Supremacists-in-Chief', NBC4 Washington, https://www.nbcwashington.com/news/national-international/rep-cori-bush-calls-trump-white-supremacist-in-chief/2540892 (last visited Nov. 22, 2021).

[20]Lawmakers of each party used distinct language on social media in days following Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/fact-tank/2021/01/15/how-lawmakers-social-media-activity-changed-in-the-days-after-the-u-s-capitol-riot/ft_2021-01-15_socialmediacongress_01/ (last visited Nov. 22, 2021).

[21]Audience engagement with posts from Democratic lawmakers increased after Jan. 6 rioting at U.S. Capitol, Pew Research Center (2021), https://www.pewresearch.org/facttank/ 2021/01/15/how-lawmakers-social-media-activity-changed-in-the-days-after-the-u-scapitol-riot/ft_2021-01-15_socialmediacongress_02 (last visited Jan. 11, 2022).

General Merrick Garland described the January 6th incident as "a heinous attack that sought to disrupt a cornerstone of our democracy" and described the individuals involved as "white supremacists . . . who stormed the Capitol." The Department of Homeland Security declared that government offices were potential targets of violent domestic extremists, who were emboldened by the "recent mob assault" on the Capitol.[22] In sum, every potential juror in the District was impacted by the events on Capitol Hill on January 6th.

Furthermore, local Washington, D.C. news was filled with coverage of the January 6th events and resulting aftermath, replete with references to "insurrectionists," "white supremacists" and even suggestions of a "race war."[23] Former President Trump has been referred to as the "leader" of these "white supremacists" and was placed on trial for "inciting an insurrection."[24] Nancy Pelosi went so far as to declare that Donald Trump was an accessory to murder.[25]

President Biden marked the one-year anniversary of the January 6th the occasion by delivering a speech from Statutory Hall in the Capitol, referring to January 6th as an "armed insurrection" and said that individuals like Fonticoba

---

[22] Hearing before the U.S. Senate Committee on the Judiciary, Merrick Brian Garland (Nominee for Attorney General), February 22, 2021 (2021), https://judiciary.senate.gov/imo/media/doc/SJC%20Testimony.final.pdf (last visited Jan. 11, 2022).

[23] Analysis: A race war evident long before the Capitol siege, WTOP, https://wtop.com/national/2021/02/analysis-a-race-war-evident-long-before-the-capitol-siege-2/ (last visited Nov. 22, 2021); Dozens charged in Capitol Riots Spewed Extremist Rhetoric, NBC4 Washington (2021), https://www.nbcwashington.com/news/national-international/dozenscharged-in-capitol-riots-spewed-extremist-rhetoric/2575102/ (last visited Nov. 22, 2021); Trump Legacy on Race Shadowed by Divisive Rhetoric, Actions, NBC4 Washington (2021), https://www.nbcwashington.com/news/politics/trump-legacy-on-race-shadowed-by-divisiverhetoric- actions/2536591 (last visited Nov. 22, 2021).

[24] Insurrection? Sedition? Unpacking the Legal Issues from the Capitol Riot, The Washington Post (2021), https://www.washingtonpost.com/business/insurrection-seditionunpacking-thelegal- issues-from-the-capitol-riot/2021/01/14/4fe1f618-5631-11eb-acc5 92d2819a1ccb_story.html (last visited Nov. 22, 2021).

[25] Nancy Pelosi on the Capitol Hill insurrection: Trump was an accessory to the crime of murder, MSNBC.com (2021), https://www.msnbc.com/msnbc/watch/nancy-pelosi-on-thecapitol- hill-insurrection-trump-was-an-accessory-to-the-crime-of-murder-99705925960 (last visited Nov. 22, 2021).

"were looking to subvert the constitution."[26] Accordingly, the combination of prejudiced politics, and prejudiced pretrial publicity, render the District of Columbia a hostile jurisdiction for the trial of Fonticoba. When considered in combination with the community prejudice of Washington D.C. to the Capitol incident, the venire is rendered so greatly tainted that a presumption of prejudice must be applied, and a change in venue is necessary to cure the prejudice.

### 3.   The Proximity Of Publicity To Trial-A D.C. Jury Cannot Be Fair And Impartial To Proud Boy Defendants

The local media continues to regularly report on J6 trials. Further, this Court recently tried the so-called Proud Boy leaders' trial where the Government repeatedly introduced evidence on Mr. Fonticoba, naming him as part of a seditious conspiracy. Mr. Fonticoba of course could not rebut or defend his name when the following evidence was presented by the Government:

-a video of Mr. Fonticoba in an airplane flying to D.C. in November 2020 with Defendant Enrique Tarrio and other Proud Boys;

-a video of Mr. Fonticoba on January 6 in a hotel room with Defendant Tarrio watching Fox News; and Sean Hannity says, "We do not support people who commit acts of violence." Fonticoba then says to screen, "Fuck you. You're a RINO piece of shit."

-during Government witness Quested's testimony, video of Mr. Fonticoba with Defndant Biggs and Nordean marching to the Capital, making hand gestures some have associated with the Proud Boys, for which Attorney Pattis moved for a mistrial because Quested's characterization of the hand signal as white supremacist.

---

[26]READ: Full Transcript of Joe Biden's Speech on the Jan. 6 Insurrection, U.S. News (2022), https://www.usnews.com/news/politics/articles/2022-01-06/read-full-transcript-of-joe-bidensspeech-on-the-jan-6-insurrection (last visited Jan. 11, 2022).

-Quested's hearsay testimony that Mr. Fonticoba admitted, off camera, to being inside the Capitol;

-Special Agent Nicole Miller testified on cross-exam by Attorney Smith about Mr. Fonticoba being present on the Capital scaffolding with Nordean and Biggs, and video was played showing the same;

-Mr. Fonticoba purportedly texting in the "Boots on Ground" telegram chat that: "We're in front of Capitol . . . we are here, we got mace and hit with paintballs."

- Mr. Fonticoba purportedly texting in the "Boots on Ground" telegram chat that: "We just stormed the Capitol."

Indeed, local D.C. media tweeted that Mr. Fonticoba's name was repeatedly

mentioned in the Government's evidence of a seditious conspiracy.

### 4.    Evidence Of Juror Partiality-The D.C. Community's Prejudice Against The Proud Boys Cannot Be Overcome Through Voir Dire

*Skilling* emphasized "the kind of vivid, unforgettable information the Court

has recognized as particularly likely to produce prejudice," when considering the

factor of jury partiality. *Skilling*, 561 U.S. at 383. According to Zogby's survey,

Washington, D.C. does not appear to be a hospitable venue for a fair trial of

Fonticoba for his alleged involvement in the events at the Capitol on January 6,

2021, based on the analysis of the overall findings:

- Q6. Greater than 9 in 10 respondents (95%) said they have overall familiarity (very and somewhat combined) with the January 6, 2021 events at the Capitol; and more than two-thirds (67%) of whom stated they are very familiar with these events.

-  Q7. A majority (54%) of the sample responded that national media sources were more responsible in shaping views about the events in question. Just under 4 out of 10 respondents (39%) said local news sources were more instrumental.

-  Q8. Just under 2 in 3 respondents (66%) agreed that the January 6, 2021 events posed a dire threat to our nation and democracy (Statement A); this sameopinion held by both age groups above 50 years old (50 – 64 and 65+ years of age) rose above three-fourths of respondents (75.1% and 78%, respectively).

- Q9. Nearly 3 out of 4 respondents (73%) believe that any individual who was inside the Capitol on January 6, 2021 should be convicted of insurrection.

- Q10. Seven in 10 respondents (70%) stated they are familiar with the Proud Boys organization. This figure climbed to 8 in 10 (78%) among 30 – 49 year-old respondents.

- Q11. When asked their opinion of the Proud Boys, over two-thirds of respondents (68%) said they hold an overall unfavorable (very and somewhat combined) opinion, with a clear majority (60%) who expressed a very unfavorable opinion.

- (Keep in mind that 54% of all respondents stated that national media sources were more instrumental in shaping their views of the January 6, 2021 events at the Capitol [Q7].)

- Q15. Seven out of 10 (70%) respondents believe that anyone who went inside the Capitol building that day were trying to stop the certification of the Electoral College vote for president. And almost two-thirds (64%) of respondents believe that despite not personally committing acts of vandalism or violence, an individual could still be held responsible for such serious crimes assuming they went inside the building that day (Q16).

- Q17. More than one-third respondents who said yes to Q16 (35%) stated the reason for holding such a view was because they believe that ANYONE who entered the building that day is guilty of such acts (Statement A). While greater than 6 in 10 respondents (62%) stated they hold such a belief because just being inside regardless of personal commission means they were involved in planning or orchestrating the events (Statement B).

Also, in a highly publicized lawsuit, the District of Columbia is suing the Proud Boys and the Oath Keepers through the prominent, high-profile law firm of Paul, Weiss, Rifkind, Wharton & Garrison, for allegedly conspiring to terrorize the city with the violent attack on the U.S. Capitol on Jan. 6. See DISTRICT OF COLUMBIA Case 1:21-cv-03267 Filed 12/14/21. And, to further pollute the jury pool, D.C. Attorney General Karl Racine boldly announced its filing:

> I'm suing the Proud Boys and Oath Keepers, the first civil lawsuit by a government entity against the Jan. 6 insurrectionists . . . They caused extensive damage to the District, our democracy and particularly the brave men and women of our Metropolitan Police Department . . . We're holding these insurrectionists accountable for conspiring to terrorize the District by planning, promoting, and participating in the deadly attack on the Capitol.

Also, D.C.'s local prosecution of the former de facto leader of the Proud Boys, Enrique Tarrio, who is also based in Miami, for burning a Black Lives Matter banner

belonging to a venerated D.C. church, heaped even more negative publicity on the Proud Boys.

To be clear, Fonticoba is not moving for a change of venue solely because D.C. residents voted overwhelmingly against President Trump. And he is not asserting that every January 6 defendant should be considered the same in deciding to transfer venue. Rather, he is moving for a change of venue because the exceptional nature of extreme prejudice against Miami-based Proud Boys charged in the J6 riot, like him. Also, he is not forum shopping for some conservative or Republican-friendly jurisdiction either. He is merely suggesting this Court use a venire from a neighboring jurisdiction, such as the Eastern District of Virginia or the District of Maryland, and still conduct the trial at the courthouse in D.C.

Further, he is not claiming that his own notoriety by itself justifies a venue change, but that his affiliation as a Miami Proud Boy who associated with Tarrio, coupled with the *Skilling* factors, mandates a change of venue. *Id*. at 378. Certainly, Fonticoba is part of this discrete group of defendants, and this warrants the rare presumption of prejudice to grant a change of venue before voir dire. *Calley v. Callaway*, 519 F.2d 184, 204 (5th Cir. 1975) (en banc) (dictum), cert. denied. 423 U.S. 888 (1976) (stating in certain rare cases "prejudice to the defendant's rights may be presumed.").

Lastly, it cannot be ignored that the vitriolic feud between the Proud Boys and D.C. dates back to the night of November 14, 2020, when Proud Boys descended

on the D.C. streets and clashed with so-called Antifa members. Shortly thereafter in December 2020, the Proud Boys made national headlines again for purportedly fighting in the D.C. streets with Antifa members. Of course the Government will seek to admit evidence of these 2020 November and December Proud Boy incidents against Fonticoba.

## CONCLUSION

As such, Fonticoba cannot obtain a trial by an impartial jury in the District of Columbia. Fonticoba submits that the parties are much more likely to find objective jurors in any district other than in Washington, D.C.; Fonticoba asks to use a venire from a neighboring district, such  as the Eastern District of Virginia or the District of Maryland, communities that were not prejudiced through the closure of their streets and a months long National Guard presence, but still hold the trial in District of Columbia. This trial can be tried in a week.

Based on the foregoing, Fonticoba has demonstrated that he faces significant prejudice in the District of Columbia, prohibitive of a fair and impartial jury as guaranteed by the Fifth and Sixth Amendments to the United States Constitution. As such, Fonticoba requests that this Honorable Court, pursuant to Fed. R. Crim. P. 21(a), use a venire from a neighboring district, such as the Eastern District of Virginia or the District of Maryland, but still hold the trial in the District of Columbia.

WHEREFORE, Fonticoba respectfully moves this District Court to grant

motion his as detailed above.

Respectfully submitted,

/s/Aubrey Webb
55 Merrick Way, Suite 212
Coral Gables, Florida 33134
305-461-1116
Email:  aubrey@aqwattorney.com

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was efiled to the Office of the Clerk, United States District Court, District of Columbia, 333 Constitution Ave., N.W. Washington D.C. 20001, Room 1225 and to the Office of the United States Attorney, 555 4th St N.W., Washington D.C. 20530, on August 10, 2023.

/s/Aubrey Webb