UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA,**

**Plaintiff,**

                                                             Case No. 21-CR-638-TJK

**vs.**

**Gilberto Fonticoba,**

**Defendant.**

_____/

**SENTENCING MEMORANDUM OF GILBERTO
FONTICOBA AND REQUEST FOR VARIANCE**

      Fonticoba submits the following memorandum to aid the Court in fashioning "a sentence sufficient, but not greater than necessary." 18 U.S.C. § 3553(a).

    **A. The Nature and Circumstances of the Offense**

      Fonticoba entered the Capitol on January 6 and exited less than three (3) minutes later. While inside, he felt incensed that others were damaging property and acting disrespectful. His paradoxical moment of clarity prompted him to exit the Capitol, leaving the other proud boys he had followed in. Since that time he has begun the long process of de-radicalization from the proud boys and political extremism.

      He is remorseful for his actions and the shame it has brought on him and his family. His actions on January 6 are not representative of who he is; he should be judged for the man he has been all of his life—not just for one day. He has no criminal history and is here to take responsibility for his actions. Unlike some January 6 defendants who eagerly make the media rounds, Fonticoba, a single father, has quietly tried to move on with his life and support his family.

1

Indeed, Fonticoba is the patriarch of his household, supporting his elderly mother and his teenage daughter who both live with him.

While the government will focus on the social media posts that he clicked like, upvoted, copied and pasted, or reposted leading up to January 6, and use slick video montages of his meeting up with other proud boys and walking over to the Capitol, in the end, he did not assault anyone; he did not possess any weapons; he did not damage any property inside the Capitol, and he did not go in any chambers or offices. He should not be punished because he was merely present with Joseph Biggs or Ethan Nordean, or in a hotel room with Enrique Tarrio. Mere presence is not a crime. The government will seek to portray Fonticoba as vicariously liable for Tarrio's, Nordean's, and Biggs's actions at sentencing. Ultimately though, as even the Pre-Sentence Report (PSR) draft makes clear, his role in the group on January 6 was as "an average participant" ¶ 120.

> **B. Fonticoba's background, family, employment history, and character**

Fonticoba is a 49-year-old Cuban-American, who was born and raised in Hialeah, Florida. Hialeah is a large, mostly Hispanic, city in Miami-Dade County. He has lived there almost his entire life. He was raised in a stable middle-class household by his mother and father, who both fled Cuba after Fidel Castro seized power and installed his authoritarian regime. Fonticoba was raised to be a law-abiding citizen and a contributing member of society. His brother is a graphic designer, who also resides in South Florida.

As a young adult, he married in 2002 and had two children, a son and a daughter. For most of his adult life, Fonticoba, who did not go to college, has worked at various jobs, always trying to support his family. He now primarily works as an Uber driver. Before that he was a salesman for an aluminum shutter company. He divorced in 2012. His ex-wife lives in neighboring Broward County and the children do see her regularly.

However, both children live with him. And Fonticoba's 15-year-old daughter goes to

the public high school near Fonticoba's home. As noted in the PSR draft, she is heavily involved extracurricular activities at the school, and Fonticoba regularly drives her to school and her afterschool events. His 20-year-old son attends St. Thomas University and is an assistant high school football coach. He does not know who will take care of his daughter if, or when, he is incarcerated, as she does not want to live with her mom or switch high schools. Further, his ex-wife travels regularly for work and will not be able to transport her to school and related activities. In addition, his mother suffers from kidney disease, diabetes, congestive heart failure, and interstitial pulmonary disease. Without Fonticoba there to help her, there is grave concern about her well-being and the ability to monitor her.

18 U.S.C. 3553(a) allows this Court to take into consideration his family ties when determining an appropriate sentence. *See United States v. Nellum*, No. 2-2:04- CR-30, 2005 BL 88941 at 4 (N.D. Ind. 2005). Certainly, he has a strong supportive family. Fonticoba has a close relationship with his mother and teenage daughter. These strong family bonds will provide the supportive network that he needs in the event the Court decides to impose a term of supervision.

In 2019 Fonticoba joined the proud boys. But his path to extremism began long before that. He does not deny that he grew up in a highly-politicized environment in Hialeah. When Fidel Castro's 26th of July Movement guerillas toppled President Fulgencio Batista's regime in Cuba in 1959, Miami became, and still is, a bastion for Cuban exiles and anti-communism fervor. And after the Bay of Pigs debacle in 1961, where US-backed Cuban exiles attempted a military invasion of Cuba to overthrow Castro, and President J. Kennedy canceled their main air support at the last second, many Cuban Americans blamed Kennedy for abandoning them and became staunch Republicans.[1] To a large extent, that animus is still alive and well today in the

---

[1] See Peter Wyden, Bay of Pigs, the Untold Story, (Simon & Schuster) (1979).

3

Miami's Cuban exile community.

As noted in the PSR, Fonticoba's father published a local newsletter that covered Cuban-American political issues and was close friends with former Hialeah Mayor Raul Martinez; Fonticoba's mother worked for then West Miami councilman Marco Rubio's campaign as an assistant in the mid-1990's. Thus, Fonticoba grew up in this hotbed of right-wing politics, hearing about his father's incarceration by Castro's security forces in Cuba for burning a flag and neighbors spying on other neighbors for the communist party.

In joining the proud boys, he was filling a void in his life; some people turn to alcohol, drugs, gambling, or sex addictions, but Fonticoba turned to political extremism. And, in doing so, he allowed others to manipulate his entrenched political sentiments. He was a follower, but today he is his own man.

C. **Fonticoba has significant medical issues**

Fonticoba is a 49-year-old man who has a number of significant health problems that are well documented by the PSR[2], including obesity, diabetes, high blood pressure, and sleep apnea.

---

[2][As noted in the draft PSR:] The defendant is 5 feet 9 inches tall and weighs approximately 285 pounds. Mr. Fonticoba does not have any tattoos.

160. Mr. Fonticoba reported the following medical conditions: Type 2 diabetes with hyperglycemia (since 2017), obesity, low testosterone (since 2017), migraines, headaches, high blood pressure, microhematuria (blood in urine), epididymal cyst, Vitamin D deficiency, obstructive sleep apnea (uses a continuous positive airway pressure (CPAP) machine), cervical spinal stenosis, testicular hypofunction, erectile dysfunction, bloated abdomen, hypertriglyceridemia (since 2013), chronic bilateral lower back pain, right foot pain and cyst between last two toes on his right foot (2023). The defendant also reported having testicular surgery at Palmetto Hospital (1998 or 1999); tumor removed from right index finger at Jackson Memorial Hospital (2012) and left kidney removed at Memorial East Hospital (2018). Additional medical records were requested.

161. Reportedly, Mr. Fonticoba is taking Lisinopril 10mg, Rosuvastain Calcium 5mg and Testosterone Cypionate 200 mg. He did not report any adverse side effects to these medications. Additionally, Mr. Fonticoba has no known allergies. The defendant stated he has never tested positive for COVID, and he is not vaccinated for the virus.

162. Defense counsel provided medical records from Dr. Jay Kim and Dr. Natassja Gangeri. The defendant has a medical history of high blood pressure, Hematuria (blood in urine), Variocele (enlargement of testicules), Hydrocele (swollen scrotum), Malignant Neoplasm of left kidney, except renal pelvis, Nocturia, left testicular pain, testicular hypofunction, erectile dysfunction and dorsalgia (back pain). He has had the following surgeries: right hand surgery, right varicocele/hydrocele, tonsillectomy, umbilical hernia, left nephrectomy (kidney removal) on August 2018 and hemorrhoids on June 20, 2022.

4

Doctors removed one of kidneys a few years ago; he sleeps with a CPAP machine due to sleep apnea; although the Bureau of Prisons has asserted that it can provide CPAP machines for inmates, he is concerned about availability of properly distilled water that is needed to daily to run it. In sum, his health conditions will make any incarceration very difficult and potentially dangerous for him.

### D. That the Supreme Court accepted certiorari on the Government's novel, first time use of § 1512(c) means this Court should vary downward or show leniency

Undoubtedly, the question now before the Supreme Court effects the validity of Mr. Fonticoba's § 1512(c) felony conviction, because it drives the calculation of his guideline range. *United States v. Fischer,* 64 F.4d 329 (D.C. Cir. 2023), cert. granted, No. 23-5572, 2023 WL 8605748 (Dec. 13, 2023). Indeed, the draft PSR uses three specific offense characteristics for § 1512(c) to enhance his offense level from 14 to 27, ending in a 24 with acceptance for a range of 51-63 months. Whereas if Mr. Fonticoba is sentenced just on the 18 U.S.C. § 231 charge, the likely applicable guideline range would be 0 to 6 months using an offense level of 8. But if the court does apply it, the novelty of its application warrants a significant downward variance.

### E.  First-time offender status

The fact that Fonticoba is a first-time offender is a basis for a downward variance. *United States v. Munoz-Nava*, 524 F.3d 1142, 1143 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65- 78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history"). That the Guidelines already take into account Fonticoba's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis. *See,e.g., United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir.

5

2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

### F. Need for treatment and training

As stated in his draft PSR and candidly at his interview, Fonticoba seeks substance abuse treatment for his marijuana dependence. Although he has Florida medical marijuana card, and his regular usage was motivated to manage the pain from his health ailments, he does not want to use marijuana at all going forward, out of fear it could lead other addictive substances and further dependence. He would respectfully ask the Court to make a Residential Drug Abuse Program (RDAP) recommendation, preferably for a Spanish-speaking RDAP program in the Bureau of Prisons (BOP). Accordingly, he meets BOP's requirements of having a verifiable substance abuse problem and desires treatment.

Regrettably, Fonticoba never finished high school, and wants to obtain his GED. Thus, he requests a recommendation for all literacy programs that involve obtaining a GED.

### G.   Fonticoba's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. *See, e.g., United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008). As explained above and during his PSR interview, he regrets his decision to enter the Capitol Building and apologizes to the residents of D.C., the Capitol and Metropolitan Police forces, and all Congress members and their staff. Fonticoba will express remorse in his allocution.

### H.   Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6). Sentencing Fonticoba in the Guidelines range proposed by the

6

government would create unwarranted sentence disparities. First, a sentence in the government's range would create hundreds of unwarranted sentence disparities between his case and the hundreds of protesters who were sentenced for a Title 40 parading offense alone. As shown above, there is no distinction between the novel § 1512(c)(2) offense and parading/demonstrating offense under § 5104(e)(2)(G). The government has never articulated how Fonticoba's actions on January 6 are distinct from that of a parading defendant. In many instances, the conduct of misdemeanor offenders was more harmful. The government could have obtained any defendants' pre-January 6 text messages and social media posts and characterized plans to protest in D.C. as threats of violence or extensive planning or corrupt intent, as it did with Fonticoba's messages in social media posts, chat rooms, group texts, and regular texts. As such, sentencing in or near the government's proposed Guidelines range would create hundreds if not thousands of unwarranted sentence disparities.

## I. The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2). The penalties he has already incurred as a result of this case are sufficient to deter him from ever again entering the Capitol and recidivating. His reputation has been denigrated in the court of public opinion, which is particularly true in today's obsessive online world. Fonticoba will struggle for the rest of his life to hold down gainful employment and live in anonymity. All of these are serious penalties for his conduct and serve as deterrence. The shame he has experienced is itself an assurance of deterrence. *See, e.g., United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions).

## J. Statutory and guideline analysis

7

In a stipulated bench trial through the parties' joint statement of facts and elements, this Court convicted Fonticoba of 18 U.S.C. § 231(a)(3), (civil disorder) and 18 U.S.C. § 1512(c)(2), (obstruction of an official proceeding). (ECF 44, 45).

The Probation Office issued a draft Presentence Report (PSR) on December 8, 2023. For Count Two, § 1512(c)(2), the PSR applied U.S.S.G. §2X5.1 and determined that the "most analogous offense guideline" was U.S.S.G. §2J1.2 (Obstruction of Justice). The PSR then grouped Counts I and II pursuant to U.S.S.G. §3D1.2(c), applied U.S.S.G. §2J1.2 as the guideline that produces the highest offense level. PSR, ¶ 131.

The PSR thus started at a base offense level of 14 under U.S.S.G. §2J1.2(a). PSR, ¶ 132. It added eight levels under the specific offense characteristic at U.S.S.G. §2J1.2(b)(1)(B), finding the offense caused or threatened to cause physical injury to a person in order to obstruct "the administration of justice." *Id.*, ¶ 133. It added another three levels under the specific offense characteristic at §2J1.2(b)(2), finding the offense resulted in substantial interference with "the administration of justice." *Id.*, ¶ 134. It added another two levels under the specific offense characteristic at §2J1.2(b)(3), finding the offense was extensive in scope, planning, or preparation. *Id.*, ¶ 135.

It then gave him a 3-level reduction for acceptance of responsibility, calculating a final total offense level of 24 with a sentencing range at 51-63 months of incarceration. PSR, ¶ 132. It also declined to award him 2-point reduction from the new zero point (for zero criminal history points) offender adjustment under U.S.S.G. § 4C1.1. Fonticoba falls in Criminal History Category I. On December 22, 2023, Fonticoba filed his objections to the draft PSR, which he incorporates herein.

### K.  Fonticoba's offenses did not involve "the administration of justice"

The PSR applied three specific offense characteristic enhancements under the

obstruction-of-justice guideline at U.S.S.G. §2J1.2: §2J1.2(b)(1)(B) (eight levels) and §2J1.2(b)(2) (three levels), §2J1.2(b)(3). They do not apply, however, either legally or factually.

These sections require a defendant's interference with "the administration of justice." U.S.S.G. §§ 2J1.2(b)(1)(B) and §2J1.2(b)(2). Congress does not administer justice. Such a holding conflicts with separation-of-power principles, not to mention ordinary language usage. *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980, _F. Supp. 3d __(D.D.C. Oct. 29, 2022). Critically, judges who have denied motions to dismiss the government's novel § 1512(c)(2) offense have reasoned that the motions should not be granted precisely because Congress does *not* administer justice. *E.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 61-65 (D.D.C. 2021) ("Congress's constitutionally assigned duties do not include the 'administration of justice. . .'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 23-24 (D.D.C. 2021). Given that the Guidelines are construed using the tools of statutory interpretation, it is difficult to understand how one reconciles that reasoning with a finding that Congress *does* administer justice, but only when it comes to finding sentencing enhancements applicable. *United States v. Savin*, 349 F.3d 27, 35-36 (2d Cir. 2003) (holding courts interpret the Guidelines just as they do statutes).

The enhancements do not apply factually here either. Nothing showed Fonticoba "causing or threatening to cause physical injury to a person." U.S.S.G. §2J1.2(b)(1)(B). Insufficient evidence showed that he caused property damage. *Id.* At most, one might infer that he helped pull down a part of the fence. No evidence showed that he damaged it. But even if the Court concludes there was sufficient evidence here, no evidence showed that he pulled down the fence "in order to obstruct the administration of justice." Even if Congress's actions that day could be regarded as "administering justice," no evidence showed that his activity at the fence was not driven by just sheer incivility.

9

Regarding "substantial interference" with the administration of justice, U.S.S.G. §2J1.2(b)(2), no evidence demonstrated that his conduct satisfied any of the examples of such conduct in the Guidelines commentary; in this regard, the commentary details evidence impairment and court functions. §2J1.2 cmt. n. 1. By definition, in a civil disorder event, "substantial inference" must take on a relative quality and mean interference more serious than the average rioter's. Otherwise, "substantial" becomes more like "just average." The evidence showed that after the incident involving the fence, Fonticoba walked in the Capitol and walked out soon thereafter. It did not show him assaulting anyone or looking for members of Congress and their staff. Therefore, the enhancement does not apply on the facts.

L. **The "offense" was not "extensive in scope, planning or preparation"**

The PSR added two levels under U.S.S.G. §2J1.2(b)(3) because "the offense was otherwise extensive in scope, planning, or preparation." The guideline reads:

> If the offense (A) involved the destruction, alteration, or fabrication of a substantial number of records, documents, or tangible objects; (B) involved the selection of any essential or especially probative record, document, or tangible object, to destroy or alter; or (C) was otherwise extensive in scope, planning, or preparation, increase by 2 levels.

§2J1.2(b)(3). The convicted proud boy leaders, Tarrio, Nordean, Biggs, and Rehl, purportedly did the planning, not Fonticoba. In applying this enhancement, he is being held vicariously accountable for their actions. Further, his reposting or liking on social media of crass political imagery should not be conflated as actual extensive planning. Similarly, when Fonticoba was involuntarily added by others to these "MOD" Whatsapp or Telegram chats and its iterations, that does not constitute extensive planning. In sum, "planning" evidence was indistinguishable from a plan to protest the election in Washington, D.C., like thousands of other people. Under the Guideline, the "offense" must be "extensive[ly] . . . plann[ed] or prepar[ed]."

M. **Fonticoba's final offense level should be a 10**

Stripped of the specific offense characteristics, his base offense level of 14 should be

10

reduced by two acceptance points to a 12, and then reduced another 2 for the new zero point adjustment, reaching a final offense level of 10, with a sentencing range of 5-12 months of incarceration. U.S.S.G. Ch. 5.

## CONCLUSION

For all the foregoing reasons, Fonticoba respectfully requests a sentence below the properly calculated Guidelines range.

Dated: January 4, 2024

Respectfully submitted,

/s/Aubrey Webb
Law Offices of Aubrey Webb
55 Merrick Way, Suite 212
Coral Gables, Florida 33134
305-461-1116
Email: aubrey@aqwattorney.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was efiled to the Office of the Clerk, United States District Court, District of Columbia, 333 Constitution Ave., N.W. Washington D.C. 20001, Room 1225 and to the Office of the United States Attorney, 555 4th St N.W., Washington D.C. 20530, on this January 4, 2023.

/s/Aubrey Webb