**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-638 (TJK)** |
| **GILBERT FONTICOBA,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Gilbert Fonticoba to 60 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $200 special assessment. The recommendation for 60 months of incarceration is at the high end of the guidelines range of 51 to 63 months. A 60-month sentence of incarceration is warranted here based on Fonticoba's coordinated criminal conduct on January 6 and consideration of all of the requisite sentencing factors under 3553(a).

As set forth in the Statement of Offense (ECF No. 44), Fonticoba prepared for and then engaged in persistent efforts to interfere with law enforcement at the Capitol and disrupt the Electoral College certification on January 6. Fonticoba prepared for and took these actions as part of a hand-selected group of Proud Boys members[1] that openly discussed its plans for violence at the Capitol and intention to confront police who might try to stand in their way. *See, e.g.*, *id.* at

---

[1] As discussed herein and set forth fully in the Statement of Offense (ECF No. 44), the Ministry of Self Defense ("MOSD") was a hand-selected group of "rally boys" who vowed to follow the commands of leadership.

¶¶ 48-59. On January 6, Fonticoba and his associates followed through, and Fonticoba was at the forefront of the breach during several critical moments. He was among the first group of rioters that forced their way through the outer police lines and onto Capitol grounds. *Id.* at ¶¶ 62-63. Also in the initial minutes of the riot, Fonticoba joined Proud Boys leaders Ethan Nordean and Joseph Biggs in their effort to tear down a fixed metal fence and unleash the masses on a thin line of police officers. *Id.* at ¶¶ 66-67. While on Capitol grounds, Fonticoba rejoiced in "storm[ing] the Capitol" with fellow Proud Boys, and Fonticoba provided his "current location" so that a fellow Proud Boys member could join the group's efforts. *Id.* at ¶¶ 70-71. After nearly an hour on Capitol grounds, when law enforcement appeared to regain control over the crowd, Fonticoba took concerted action—again as part of a group—to return to the frontlines and participate in a fateful push up the concrete stairs toward the Capitol building. *Id.* at ¶¶ 72-73. Fonticoba then joined other Proud Boys, including Joseph Biggs, as they were among the first wave of rioters to enter the Capitol building as Members of Congress were still in session. *Id.* at ¶¶ 78-82. Shortly after entering, Fonticoba proudly reported back to other Proud Boys, "We just stormed the capital [sic]." *Id.* at ¶ 85. After leaving the Capitol Fonticoba traveled to Baltimore, Maryland, where he continued to celebrate the day's events with the Proud Boys chairman, Enrique Tarrio. *Id.* at ¶ 87.

Fonticoba did not regret his actions on January 6; he reveled in them. With respect to those who condemned violence and called for prosecution of those who had stormed the Capitol, Fonticoba voiced his disdain with repeated rejoinders of "Fuck you." *Id.* at ¶ 89. With respect to the officers who had bravely fought to protect the Capitol and its occupants, Fonticoba offered "Fuck the Blue." *Id.* at ¶ 86. And while knowing full well that he and his associates had been at the vanguard of the riot, Fonticoba used social media to advance the false narrative that police

officers and Antifa had engaged in a "false flag operation" at the Capitol. *Id.* at ¶ 92.

Fonticoba's rampage on January 6 was not the result of mistake or accident; his actions had a purpose. Fonticoba breached the Capitol grounds and building, helped destroy the black metal fence, and interfered with officers who were trying to stop the crowd's advance because he wanted to stop the Certification of the Electoral College vote. *Id.* at ¶ 93. And Fonticoba took these actions in concert with others who shared in his criminal purpose. *See United States v. Ethan Nordean*, *et al.*, 21-cr-175 (TJK) at ECF 855-2 (Ethan Nordean Sentencing Memorandum) and ECF 855-3 (Joseph Biggs Sentencing Memorandum).

Fonticoba's calculated and coordinated conduct on January 6, along with his lack of genuine remorse or acknowledgement of the seriousness of his crime, warrants the imposition of a significant sentence. For the reasons outlined herein, the government recommends that the Court sentence Fonticoba to 60 months of incarceration for his convictions of violating 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231.

## I.      FACTUAL BACKGROUND

The government incorporates the Statement of Offense filed in this case, ECF No. 44.

## II.     THE CHARGES AND CONVICTIONS

On October 22, 2021, a federal grand jury returned an indictment charging Gilbert Fonticoba with six counts: violations of 18 U.S.C. §§ 1512(c)(2) and 2; 18 U.S.C. § 231(a)(3); 18 U.S.C.   § 1752(a)(1);   18   U.S.C.   § 1752(a)(2);   40   U.S.C.   § 5104(e)(2)(D);   and   40 U.S.C. § 5104(e)(2)(G).

On October 6, 2023, following a stipulated bench trial on Counts One and Two, this Court found Fonticoba guilty of violating 18 U.S.C. §§ 1512(c)(2), 2 and 18 U.S.C. § 231(a)(3).

### III.  STATUTORY PENALTIES

Fonticoba now faces sentencing on Count One (18 U.S.C. §§ 1512(c)(2) and 2) and Count Two (18 U.S.C. § 231(a)(3)). As noted by the Presentence Report issued by the U.S. Probation Office, Fonticoba faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100 on Count One, and 5 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of $100.

### IV.  THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Presentence Report correctly sets forth the Guidelines calculations, PSR ¶¶ 132-138 (ECF No. 54):

Count One: 18 U.S.C. § 1512(c)(2)

| U.S.S.G. § 2J1.2(a) | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2J1.2(b)(1)(B) | Threat or Physical Injury to Person or Property | +8 |
| U.S.S.G. § 2J1.2(b)(2) | Resulted in Substantial Interference | +3 |
| U.S.S.G. § 2J1.2(b)(3)(C) | Scope, Planning, or Preparation | +2 |
| | **Total** | **27** |

This Court thoroughly evaluated the advisory Sentencing Guidelines and Specific Offense Characteristics when sentencing Fonticoba's Proud Boys associates. *See*, *e.g.*, *United States v. Joseph Biggs*, 21-cr-175 (TJK), Sent Hr'g Tr. (Aug. 31, 2023). Following extensive briefing and argument during a series of contested hearings, this Court applied all of the Specific Offense Characteristics listed above to Fonticoba's associates. *See*, *e.g.*, *id.* at 17:16-25:17 (Aug. 31, 2023)

4

(application of 2J1.2(b)(1)(B), (b)(2), (b)(3)(C)). The Specific Offense Characteristics are also correctly applied here.

First, Section 2J1.2(b)(1)(B) applies where a defendant directly caused injury, threatened injury, or damaged property. This enhancement plainly applies based upon the defendant's own conduct here. *See* U.S.S.G. § 1B1.3(a)(1)(A). To begin, Fonticoba directly participated in destruction of property, *i.e.*, a black metal fence, which allowed rioters to advance toward the Capitol. ECF 44 at ¶¶ 66-67. Additionally, Fonticoba's actions of joining the first wave of rioters to breach the Capitol grounds and building at 12:53 p.m. (*id.* at ¶ 63-64) and his coordinated push up a concrete set of stairs at approximately 1:45 p.m. (*id.* at ¶ 72-74) directly threatened injury to the officers guarding the outer perimeter. But that's not all. The relevant conduct provisions of U.S.S.G. § 1B1.3(a)(1)(B) also encompass the acts and omissions of other members of a jointly undertaken criminal plan, scheme, endeavor, or enterprise so long as those actions are (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity. Fonticoba's participation in communications among members of the MOSD included communications that openly discussed the potential for violence at the Capitol on January 6. *Id.* at ¶¶ 47-50. This open discussion of violence continued as Fonticoba marched toward the Capitol on January 6. *Id.* at ¶¶ 58-59. And Fonticoba joined in these acts of violence with others as he ripped down a metal fence (*e.g.*, with Ethan Nordean and Joseph Biggs) and stormed up the concrete stairs toward the Capitol (e.g., behind assaults by Daniel Lyons Scott). The physical injury to police officers and property damage to the Capitol Building was reasonably foreseeable to Fonticoba and within the scope of the group's criminal endeavor, which brings such conduct within the scope of "relevant conduct" for

sentencing.

Second, Section 2J1.2(b)(2) applies where "[t]he offense resulted in substantial interference with the administration of justice." The term "substantial interference with the administration of justice" as defined in the commentary, "include[s] . . . the unnecessary expenditure of substantial governmental or court resources." *See* U.S.S.G. § 2J1.2(b)(2), Application Note 1. Fonticoba was found guilty of corruptly obstructing and impeding an official proceeding, namely the Congressional certification of the Electoral College vote count, and he admitted as much in the Joint Statement of Offense, ECF 44. The riot resulted in evacuations, vote count delays, officer injuries, and more than 2.9 million dollars in losses. As described herein, law enforcement officials from all over the D.C. metropolitan area responded to assist in protecting the Capitol from the rioters.

Finally, Section 2J1.2(b)(3)(C) applies "[i]f the offense . . . was otherwise extensive in scope, planning, or preparation." Fonticoba's relevant conduct shows that his offense was extensive in scope, planning, and preparation. His planning began as early as December 27, 2020, when he joined the "Ministry of Self Defense" – a new Proud Boys chapter for "national rally planning" that included only "hand selected members." MOSD members openly communicated about the potential for violence at the Capitol on January 6. On January 6, a group of nearly 100 Proud Boys, Fonticoba included, gathered at the Washington Monument. They employed radio communications devices and coordinated movements to stay together as a large group. The men first surveilled the Capitol's perimeter defenses and then lay in wait for approximately 30 minutes until just before the certification was to commence. Shortly before 1 p.m.—the Constitutionally mandated start time for the Certification proceedings—Fonticoba and the group marched to the

West Front of the Capitol. Within minutes, they charged forward *en masse*, overwhelming the defenses at the Capitol. The scope of Fonticoba's objective was enormous: to forcibly prevent an entire branch of the federal government from performing its constitutional and statutory duties.

With respect to Count Two, Fonticoba's advisory Sentencing Guidelines range is as follows:

Count Two: 18 U.S.C. § 231(a)(3)

| | | | |
|---|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | | <u>10</u> |
| | | **Total** | **10** |

*Grouping.* Under U.S.S.G. § 3D1.2(c), a count that "embodies conduct that is treated as a specific offense characteristic in" another guideline groups with the guideline for that count. In Count Two, Fonticoba was found guilty of interference with police officers during a civil disorder. That conduct supports application of the specific offense characteristic in U.S.S.G. § 2J1.2(b)(1)(B) of "causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice." The PSR correctly calculates that Counts One and Two group. PSR ¶ 130. Accordingly, the total offense level is the highest offense level of the counts in the group, *i.e.*, that for Obstruction of an Official Proceeding, *see* U.S.S.G. § 3D1.3(a), and the combined offense level for these offenses is 27.

*Acceptance of Responsibility (U.S.S.G. § 3E1.1).* Section 3E1.1(a) provides a two-level decrease in offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Similarly, Section 3E1.1(b) provides for an additional one-level reduction in offense level in certain circumstances applicable here. In determining whether to apply the adjustment, a court should consider, among other things, whether the defendant "truthfully admitt[ed] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or [did] not falsely

deny[] any additional relevant conduct for which the defendant is accountable under § 1B1.3"—
which includes "all acts and omissions committed, aided, abetted, counseled, commanded,
induced, procured, or willfully caused by the defendant" and all harm caused by those acts or
omissions or was the object of those acts or omissions. U.S.S.G. §§ 1B1.3(a)(1)(A), 3E1.1 cmt.
n.1(A). The government agrees that Fonticoba is entitled to a three-level downward adjustment
under U.S.S.G. § 3E1.1(a) and (b) because he agreed to a stipulated trial and thus did not contest
the factual bases for his guilt for the two counts of conviction.

*Zero-Point Offender Reduction (U.S.S.G. § 4C1.1)*. Recent amendments to the Sentencing
Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level
decrease in the offense level for offenders who have no criminal history points and who meet
certain additional criteria. Section 4C1.1 does not apply here because Fonticoba does not meet the
additional criteria. Specifically, Fonticoba used violence in connection with the offense, including
when he reached forward, grabbed the fence, and assisted Biggs and others in pulling the fence
down toward the ground as Officers S.C., S.P., and S.P. attempted to stop the crowd from
advancing past the barrier that officers were using to help control the crowd. In addition, Fonticoba
and others in his group surged past a police line, tore down other barricades guarded by officers,
and shoved officers guarding a set of stairs. *See* 4C1.1(a)(3) (The Section 4C1.1 adjustment is
applicable if the defendant meets the following criteria: "the defendant did not use violence or
credible threats of violence in connection with the offense").

Further, the January 6 riot was a violent attack that threatened the lives of legislators and
their staff, interrupted the certification of the 2020 Electoral College vote count, did irrevocable
harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in

losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g.*, *United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Fonticoba's conduct and personal contribution to the violence of the day make him ineligible for the reduction available at Section 4C1.1.

*Criminal History Category*. The U.S. Probation Office calculated Fonticoba's criminal history as Category I, which the government does not dispute. PSR ¶ 146.

*Advisory Sentencing Guidelines.* Based on the application of the Guidelines, Fonticoba's properly calculated final offense level is 24 (*i.e.*, Offense Level 27 *less* 3 points for acceptance). At Criminal History Category I and Offense Level 24, the advisory sentencing range is 51 to 63 months.

## V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As described in the Statement of Offense incorporated herein (ECF No. 44), Fonticoba's

felonious conduct on January 6, 2021 was part of a massive riot that, for a time, succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and pushing the United States to the brink of a Constitutional crisis. Fonticoba's actions on January 6 were not random acts. As reflected in the agreed Joint Statement of Offense, Fonticoba's actions were taken to stop the certification of the electoral college vote. ECF 44 at ¶ 93. And Fonticoba appreciated the significance of the certification proceedings at the Capitol on January 6, including the convocation of a Joint Session of Congress to formally count the votes of a democratic election (*id.* at ¶¶ 37-42) and the involvement of the Vice President of the United States in the proceedings (*id.* at ¶ 42).

Nevertheless, in the lead-up to January 6, Fonticoba joined a group of men who were undertaking extensive efforts to amass and direct force and violence against the Capitol. In the private, encrypted chatrooms in which Fonticoba participated with his fellow Proud Boys, the men discussed the use of force, including anticipated violence in connection with the certification proceeding on January 6. *Id.* at ¶ 48 (Gabriel Garcia—a friend and fellow Vice City Proud Boys member—announced to the group that it was "time to stack those bodies in front of Capitol Hill."). And when the time for "stacking bodies" at the Capitol came, Fonticoba provided direction to Garcia so that Garcia could join in the melee. *Id.* at ¶ 71 (providing Garcia with his precise location and advising that "[w]e are here and we got [maced] and hit with paint balls.").

On January 6, Fonticoba personally joined in and contributed to the efforts of his group and the mob in general. He remained close to other Proud Boys, including Joseph Biggs, throughout the day. And, when necessary, Fonticoba contributed to the violence of the day. Fonticoba joined Nordean and Biggs in ripping down a black metal fence, unleashing the mob into

the West Plaza of the Capitol. Nearly one hour later, Fonticoba joined Biggs and others as they surged with the crowd up the concrete stairs toward the Capitol. And Fonticoba celebrated the *group's* achievements upon breaching the Capitol—he reported back to the men in the encrypted chat, "*We* just stormed the capital." *Id.* at ¶ 85 (emphasis added). After storming the Capitol, Fonticoba continued to celebrate the achievements of the group. He traveled to Baltimore, Maryland, to celebrate with Enrique Tarrio and continued to promote his involvement in storming the Capitol as part of the group. *Id.* at ¶¶ 87-90 ("We breached the fuckin' Capitol hill, brah.").

Fonticoba willingly joined in a collective effort that brought violence to the Capitol on January 6 in an effort to change the course of American history. The sentence imposed by this Court must reflect the seriousness of that offense.

### B.      Fonticoba's History and Characteristics

Fonticoba joined the Proud Boys as early as 2019. In doing so, Fonticoba chose to affiliate himself with a group that placed a premium on violence. And Fonticoba zealously promoted his involvement in the group's violent conduct. After joining the Proud Boys in Washington, D.C. on November 14-15, 2020, Fonticoba celebrated acts of violence by the group. *Id.* at ¶ 26 ("[S]ome of them got their heads caved in tonight . . . ."); *id.* at ¶ 29 ("Victory cigar after we kicked on Antifa ass #ProudBoysDidNothingWrong").

On January 6, Fonticoba contributed to the group's violence at the Capitol, and after January 6, Fonticoba continued to celebrate the violence that occurred. As explained above, when a television commentator stated that "we do not support those that commit acts of violence" in

relation to January 6, Fonticoba responded, "Fuck you. You're a RINO [unintelligible] piece of shit." *Id.* at ¶ 89.

In the immediate aftermath of January 6, Fonticoba took to social media to promote a false narrative that police officers and Antifa had engaged in a false flag operation. *Id.* at ¶ 92. The government further notes that Fonticoba appears committed to the promotion of this false narrative. *See* ECF 54 at *44 (objecting to Paragraph 103 of the PSR). This is all particularly duplicitous considering Fonticoba's admitted conduct and contemporaneous promotion of *his group's* involvement in the siege. *Id.* at ¶ 90 ("*We* breached the fuckin' Capitol hill, brah. *We* breached the fuckin' Capitol building, brah. That shit was fuckin' intense as fuck, bro.") (emphasis added).

After January 6, Fonticoba shared information on how to avoid "surveillance" by law enforcement officials, including posting "sentries armed with cameras" during Proud Boys "club meetings" in order to take "pics of any suspected stakeout" by law enforcement. *Id.* at ¶ 95.

To his credit, Fonticoba does not have a criminal history. However, Fonticoba's history and characteristics do not otherwise reflect respect for the rule of law. In addition to the points set forth above, it is worth noting that Fonticoba appears committed to the belief that he did nothing wrong on January 6. PSR ¶ 188 (publicly questioning "[w]hat crimes [] he commit[ted]" and asserting that the "DOJ is wasting money . . . going after [all the] little guys for expressing their right to free speech and dissent.").

Fonticoba's history and characteristics weigh in favor of a lengthy term of incarceration.

### C.      The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Fonticoba's criminal conduct on January 6 was the epitome of disrespect for the law. Since January 6, Fonticoba has done little to demonstrate that he appreciates the severity of his crime. *See*, *e.g.*, *id.*

The government notes that, in conjunction with this sentencing, Fonticoba provided a written statement to the Probation Office that purported to accept responsibility for his actions. PSR ¶ 125. However, in doing so, Fonticoba appears to engage in revisionist history in his suggestion that, on January 6, he was angry at other rioters who were "damaging property and celebrating." *Id.* This claim should be evaluated against the full accounting of Fonticoba's conduct on January 6, including his repeated celebration of storming the Capitol. ECF 44 at ¶ 85 ("We just stormed the Capitol[.]"); *see also id.* at ¶ 90. In fact, Fonticoba continued to follow and literally support Joseph Biggs's efforts to storm the Capitol (*id.* at ¶ 76) even after Biggs and Nordean "initiated the dismantling" of the black metal fence (PSR at *44). In fact, Fonticoba exhibited nothing but pride throughout the day's experience. *See*, *e.g.*, ECF 44 at ¶ 70:



### D.        The Need for the Sentence to Afford Adequate Deterrence

As this Court has recognized, the election may be over, but all politics is not. Free and democratic elections are a bedrock principle of this country, and a significant sentence furthers legitimate goals of general and specific deterrence of political violence.

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). Here, the need to deter others is especially strong in crimes that are calculated to influence or affect the conduct of government by intimidation or coercion, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

The need for both general and specific deterrence is also especially strong because of Fonticoba's choice of target (the Constitutionally-mandated certification of a democratic election) and Fonticoba's participation in a criminal collective. *See Callanan v. United States*, 364 U.S. 587, 593 (1961) (noting that a "partnership in crime—presents a greater potential threat to the public than individual delicts. Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality").

All of these factors weigh heavily in favor of a lengthy term of incarceration.

---

[2] *See* 18 U.S.C. § 2332b(g)(5)(A) (defining "federal crime of terrorism"). The government asserts that Note 4 of U.S.S.G. § 3A1.4 applies to Fonticoba's conduct. However, given the Court's previous guidance on the application of Note 4 to Fonticoba's co-conspirators, the government does not intend to advance this argument in this case. *See United States v. Ethan Nordean, et. al.*, 21-cr-175 (TJK), Sent. Hr'g Tr. at 35:19 – 38:8 (Aug. 31, 2023).

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hr'g Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hr'g Tr. at 49 ("[A]s far as disparity goes, . . . I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[4]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

First, in *United States v. Pruitt*, 21-cr-23, this Court sentenced the defendant to 55 months of incarceration, following a guilty plea to one count of violating 18 U.S.C. § 1512(c)(2). Like Fonticoba, Pruitt was a member of the Proud Boys. However, unlike Pruitt, who largely acted alone on January 6, Fonticoba was a hand-selected member of the MOSD who closely coordinated his preparations and actions with the leadership of the MOSD, including the commission of every unlawful act taken by Fonticoba on Capitol grounds.[5] While Pruitt remained inside the Capitol

---

overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Sent. Hr'g Tr. at 24-25 (Aug. 26, 2022) ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[5] Pruitt's offense level under the Sentencing Guidelines was 22, whereas Fonticoba's is 24 due to the application of the additional Specific Offense Characteristic for extensive scope, planning, and preparation. U.S.S.G. § 2J1.2(b)(3).

significantly longer than Fonticoba, Fonticoba's actions outside the Capitol are distinguishable. Simply put, Fonticoba did more to contribute to the mob's advance on the Capitol building, *e.g.*, participating in the initial breach at First Street and the destruction of the black metal fence and joining in the push up the concrete stairs toward the windows and doors of the Capitol.

Second, in *United States v. Daniel Lyons Scott*, 21-cr-292 (RCL), Judge Lamberth sentenced the defendant to 60 months of incarceration following a guilty plea to violating 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 111(a).[6]  Like Fonticoba, Scott was a member of the Proud Boys on January 6, 2021. Scott openly encouraged his fellow Proud Boys members to "take the fucking Capitol" while they gathered on the Capitol's east plaza at 11:45 a.m. that day, over an hour before the first breach of the Capitol grounds. Scott entered Capitol grounds shortly after the first wave of rioters. Scott used his size and strength to push through the line of officers guarding the entrance to the concrete stairs. Scott's push helped initiate other rioters' advance up the stairs, which ultimately led to the first breach of the Capitol building. Although Fonticoba did not physically make contact with officers like Scott, Fonticoba joined in the mob's efforts to push up the concrete stairs toward the building. And Fonticoba, unlike Scott, eventually entered the building. Moreover, Fonticoba's conduct on January 6 also included earlier contributions to the mob's advance, including the destruction of the black metal fence at 12:57 p.m.

When all of the 3553(a) factors are considered for Fonticoba, the imposition of a 60-month term of imprisonment would create no unwarranted sentencing disparities.

---

[6]  Like Fonticoba, Scott's offense level under the Sentencing Guidelines was 24.

## VI.    RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.  § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Fonticoba was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[7]

Because Fonticoba engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the

---

[7] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Fonticoba to pay $2,000 in restitution for his convictions on Counts One and Two. This amount fairly reflects Fonticoba's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.   FINE

Fonticoba's convictions under Sections 1512 and 231 subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case. As the PSR notes, Fonticoba has raised $2,905 in an online campaign styled as a fund to support Fonticoba as an "American patriot and a Proud Boy." PSR ¶ 188. In the posting requesting donations, the website indicates that Fonticoba is being

prosecuted for exercising his right to "free speech and dissent." Fonticoba should not be able to capitalize on his participation in the Capitol breach in this way.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 60 months of incarceration, 3 years of supervised release, $2,000 in restitution, and a $200 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   */s/ Ashley Akers*
ASHLEY AKERS
    MO Bar #69601
JASON B.A. MCCULLOUGH
    NY Bar No. 4544953
    DC Bar No. 998006
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 353-0521
Ashley.Akers@usdoj.gov
